Good morning, everyone. My name is John Peterson. I'm the counsel for Inn Foods in this case. With me today is Scott White, we also counsel for Inn Foods. In levying withhold duties and penalties on Inn Foods, we've alleged in our briefs that the Court of International Trade committed four legal errors. I'd like to discuss three of them today. I said jokingly to my clerks that this case was over when I read Cayman Islands. What I really mean is, isn't there an awful lot here to show that there was a double invoicing scheme and an effort to using shell corporations to void customers' duties? No, Your Honor. I think the problem is that, you know, SICA wasn't a shell corporation. It may have been incorporated in the Cayman Islands. But as far as customs was concerned, it was a regular corporation. It had its own importer identification number. It had its own bonds. It had its own customs broker. And it filed its own entries. Now, the problem here is the fact that the Court of International Trade went to Inn Foods and said to Inn Foods, you're not the importer of the record, but we're going to hold you liable for withheld duties that are owed by another company, SeaVeg. You mentioned the bonds, and the bonds are filled through the briefs, but I couldn't pin down what happened with respect to the bonds, if anything. Well, the government did make separate claims against bonds of Inn Foods and SeaVeg for duties. Against the surety. Against the surety. The surety paid, and I believe each of those companies separately reimbursed their surety for the monies that the sureties paid. And the point is that— But they presumably—bonds were not sufficient to cover the entire obligation. Bonds were not sufficient to cover the entire obligation claimed by the government. Is the government trying to get double recovery under the bonds? No, the government has credited us in this case with the amounts they received under the bonds. And see, there's no double recovery because there were separate entries. There were certain entries filed by Inn Foods, certain entries filed by SeaVeg. They're separate companies. They may have been under common ownership of the superior company, Valley Packing Services. And what the Court of International Trade tried to do here is they said, we're going to impose vicarious liability for customs duties. Could I understand, do you agree that because Inn Foods was found to be a hater, that they're liable for the fraud penalty or subsection of that? Assuming that the evidence is sufficient to establish that. Well, the only way that Inn Foods can be liable for a fraud penalty, and we'll address this later, assuming— Does the alter ego issue have anything to do with the penalty claim under subsection A? Not as such. The question under the penalty claim under subsection A is whether Inn Foods actively aided and abetted fraud by SeaVeg. So if it did, there's liability for the— If they did, there's liability. Whether or not there's an alter ego finding states, right? That would be correct. Because there's a difference. Section 592A throws a broader net. It imposes liability for duties on importers and anyone who enters or attempts to enter or aids and abets an attempt to enter goods by means of false and material statements. Section 592D, this Court has found, is very different. It's not a penal provision. It's a restitutionary provision. But Bloom seems to read D as broader than that. It seems to suggest that the people who would be caught by A are liable under D, plus people who would ordinarily be liable for the customs duty regardless of fraud are also liable under D. No. The only thing that the Court held under Bloom is that persons, quote, traditionally responsible for the payment of customs duties can be subject to D duties. That would be the importer of record, and it's contrary. Why shouldn't we read—whether or not I'm correct about what Bloom is saying, why shouldn't we read D as making it either a better—either or a better fraud liable not only for the penalties but also for the customs duty? Because aid and abetting is essentially a fraud concept. It can only exist in fraud. Fraud is only relevant for purposes of subsection A. Subsection D doesn't involve any degrees of culpability. Subsection D says if there's been a violation of subsection A, regardless of the level of culpability, customs shall require the restoration of duties. But what sense does it make to say that an abeter and abetter that's found liable for the penalty under A is not liable for the customs duties under D? Because customs duties are a statutory imposition. The Congress is the only one who can impose a customs duty by the Constitution, and Congress is an active statute saying the importer of record is the party who is liable. It's not for a court to turn around and say— D doesn't talk about the importer of record. It seems to say that if somebody's liable—if there's an A situation, that is a fraud, then there's liability also for the customs duty. It doesn't, on its face, limit that liability to the importer of record. The jury doesn't. That's—section 592D is so limited by the decisions of this court. Well, forget—put aside the decisions. What's the language in D that limits the liability for the importer of record and the jury? It's the restitutionary language saying notwithstanding penalties, the government shall require the lawful restoration of duties. Restoration of duties is, again, a concept that derives from the sections of the statute making the importer of record liable. They don't have—no court would have the power to contravene Congress and say, well, here's a case where I think as an equitable matter, I'm going to take somebody who's not the importer. The question is not whether we're going to rewrite D. Of course we're not going to rewrite D. The question is how do we interpret D. The court in the past has required it in the Jack and Torrey case has said—this court has said D is non-penal, it's restitutionary, and it does not allow any discretion in the trial court. The trial court doesn't have discretion about whether or not to collect duties, and we submit it doesn't have authority to go to persons who would not be traditionally liable for paying the duties and say, well, we're going to make you pay the duties. If you look, for instance, at the document on page 123 of the appendix, that's the Mexican importer who says the invoice is going to read one way, but the actual transaction price we all know is something different. If you couple that with the fact that in foods is a part of every transaction, don't you come up with a pretty sound conclusion that there's fraud permeating the entire relationship? Not at all, and there's two reasons. Why can't the court come to that conclusion, the trial court? Well, the trial court could not come to the conclusion of fraud, at least with regard to entries made on or after April 10th of 1989, because beginning on that date, both in foods and CBAG, put specific disclaimers on their invoices, and those disclaimers said essentially these are provisional values, they're not to be used for the assessment of duties. Now, at that point, we question whether you could have a violation at all, because in order to have a violation of 592, you have to have a statement which is both false and material. Materiality has been defined as having the possibility of resulting in the incorrect assessment of duties. How can a statement on an invoice possibly have the possibility of... But did in foods ever go back and give customs the actual transaction price? Yes, Your Honor. In foods went through an audit. In foods went through a protest system. Customs essentially... Did they give back the actual transaction value, or did they just attach disclaimers from that time forward? No, they underwent an audit. Customs liquidated the entity... You mean after the investigation began? After the investigation began. I think the point of Judge Rader's question, if you're right, is that did they offer... Before the investigative audit was on, did they come forward with the correct figures? Well, the question of what the correct figures were is a matter that was determined under the audit. And, in fact, customs did liquidate the duties with an increase. In foods protested the increases, and in separate court of international trade litigation settled the duty matter with the government. So it's not fair to say that in foods didn't follow up. So, in fact, they never supplemented their incorrect invoices with the proper values and made good on them? Oh, they did. They supplemented those invoices in the course of the audit. They more than made good on it. They paid all those duties, plus additional duties. They protested the assessments, and they ultimately reached a settlement in separate litigation in the court of international trade. See, that's the importance of the disclaimer statement. And this court said in the Hitachi case, that was a case where the question was whether certain escalation payments were disclosed for valuation purposes. In that case, the court said, just putting a reference on the invoice to the contract number, while it might not have been a statement of correct duty, it certainly was sufficient to eliminate any notion of fraud. You couldn't have fraud if you're disclosing the fact that this is a provisional invoice. If you say it's negligent or it's not the correct value, that's one thing. But see, the court of international trade erred in saying that this was fraud. It was the government's burden to prove by clear and convincing evidence that there was fraud here. You can't have fraud where you're making a disclosure that these values are not to be used for duty assessment. And that's a fundamental error of the court below. A second fundamental error of the court below, which I think pervades the duty question and the question on penalty liability, involves piercing a corporate veil. They didn't do a proper corporate veil piercing test. They said, well, in foods and seabed were all burritos. They had evidence of common ownership, common management. But that's not sufficient. In order to pierce a corporate veil, the trial court first has to say, OK, what law applies? In this case, if it's California law, there's a two-step test. You not only have to prove the commonality of ownership, but you have to prove that there was some domination of one company by the other and that one company used the corporate form of the other to perpetrate some fraud or to perpetrate some misbehavior. You don't have that here. You have two companies, two sister companies, committing the same errors, the same types of errors. You don't have one company controlling the other. Now, this court, on the veil piercing theory, in the Worthington case and in the 3M case, has said you have to have both elements. You don't have that second element here. The only thing, the only thing that the CIT says is in paragraph 12 of their fact line, where they say, well, Infoods was involved in some way in all of the sea bass transactions. That's not enough. It's a matter of law. You have to have a proper veil piercing. If I could, I'd like to invite the court's attention to a more recent decision of the U.S. Court of International Trade, Aegis Insurance versus Matthews, decided last fall. And that was a case where Judge Asani did what we consider to be a proper veil piercing analysis. She looked at the law. She said, well, if, they said, if the stockholder of the importer can be liable, there has to be a veil piercing analysis and we have to show not only that there was control, but there was abuse of the corporate form, and you have to look at the relevant law. Those are the two main legal errors here. I didn't see that you cited that case in your brief, did you? It was decided after the briefs were filed. Do you have a citation for it? I will get it. It's Aegis Insurance versus Matthews, and I will provide the citation for it. And you won't provide it to your opposing counsel unless you already have it. I will. I don't have it at hand now, but I will get it. I don't deserve my time. Thank you, Mr. Peterson. Thank you, Mr. Silverbrine. Good morning, Honorars. May it please the Court. The Court need not reach the veil piercing issue. Section 592 liability is not limited to the importer of record, and the statute is clear on its face. Specifically, 1592d says that, Customs shall require that lawful duties, taxes, and fees be restored, whether or not the monetary penalty is assessed pursuant to a self-selectionated violation. As a whole, the statute clearly envisions non-importers of record paying duties, and you can see that if you go to 1592c.4, which is the prior disclosure portion of the statute, in 1592c.4a and b, in order to effect a prior disclosure and receive a reduction in potential penalties, a violator of a must, in fact, pay the lost duties. So c envisions that a violator of a, whether or not they're an importer of record, can reduce their potential penalties by paying lost duties. Therefore, there's no basis to argue that the same a violator should not be liable for duties incomplete. And this Court, in fact, held in Bloom that Section d liability is not limited to violators of a, but may be assessed against those deemed responsible for the duties. But doesn't influence have a point that there's an adequate remedy of law for the government? They could have at any time increased the bond amount to cover any deficiencies, and thereby, through sureties, guaranteed themselves the full duty amount. There may have been an adequate remedy at law at the time, had customs CDP known of the fraud that was occurring. However, the bond amount was sufficient for the values that were being declared at the time. The values being declared were approximately 50% less than the actual value of the import of the merchandise. Isn't there a time, however, when the government recognizes enough to start an investigation, and at that point, perhaps could have increased its bond to protect itself in the event that the investigation proves that there's a problem? It's certainly a possibility, Your Honor. Customs could have used its regulations. With that available to you, why should we go this other route? Your Honor, my point was not that you should go the other route. It's not necessary. The other route, the alter ego theory. The alter ego theory is not necessary, because INFU is liable under 1592D. As I was stating, 1592D makes a violator of Section A liable for duties under D. Therefore, you need not reach the issue of alter ego. However, if you were to reach the alter ego issue, there is no current legal remedy, and there was none when this suit was filed. Therefore, you would go to the alter ego remedy. As we demonstrated at trial, CVEJ declared bankruptcy specifically because it was subject to these additional customs duties and could not or would not pay them. The purpose of the bankruptcy was to, in fact, avoid the duties that were due. The bankruptcy was under kingdom law. Is that correct? I believe so, Your Honor. I'm not certain of that, but I believe so. I get that impression. It was certainly incorporated under kingdom law, so I believe the bankruptcy was under kingdom law as well. Is there any legislative history of 1592? There is, but the legislative history does not specifically discuss this issue of whether or not. The statute would not make sense to not allow for somebody who caused the United States to lose revenue by a negligent, grossly negligent, or fraudulent violation of A, the cause of those lost duties, not to be liable for those duties in the latter instance. I'm sorry, go ahead. Please, go ahead. Focusing on the alter ego slash Dale Pearson issue for a moment, first question, what law do you think applies? State law or federal common law? I believe in this case it would be federal common law, Your Honor. The court of national jurisdiction is subject to federal statutes, not any specific state statutes. And I don't have anything to cite for the proposition that federal common law would apply. But in other instances, the agencies which are subject to court of national jurisdiction are in fact subject to common law doctrines when the statute is specifically addressed the issue. I'm sorry. No, go ahead. That being the case, assuming that that's the case, do you see any difference substantively between the federal common law of alter ego slash Dale Pearson and the law of California? Substantively? No, Your Honor. I do not. In this case, there was clear evidence that Infoods and Sea Veg were operating as essentially the same business. In fact, Infoods paid all the customs duties that were ever paid in this case. Sea Veg didn't pay any of them. All the monies that were paid, the invoices that were paid, came from Infoods' accounts. They were housed in the same building. They were subsidiaries of the same company. We called one of Infoods' employees as a witness at trial, and she testified that she believed Sea Veg was in fact the department of Infoods. How would you respond to Mr. Peterson's argument that there was no showing that the second of the two California requirements, that is to say the use of the second corporation by the first to perpetrate a fraud, how is that satisfied in this case in your view? There was testimony at trial, Your Honor, that the sole purpose in incorporating Sea Veg was to deceive Sea Veg and Infoods' customers because the owners of Infoods did not want the customers to know they were buying from the same as their competitors. What was the purpose? I didn't understand what the purpose of that particular deceit was. Isn't that just to attract more customers? Yes, Your Honor. It wasn't related to the fraud on the customers. I don't believe the original formation of the... there was no testimony that the original formation of Sea Veg was intended to defraud the government. It was the fact that it deceived the customers. Do you think that it was used at some point to defraud the government? As opposed to being two independent entities, both of which were engaged, or at least one of which was engaged, was there a way in which Infoods was using Sea Veg to perpetrate a fraud on the customers? There was no testimony to that effect. They were used interchangeably. So your reliance for the second of the two prongs of the California standard is entirely the defrauding of the customers at the outset? Well, the defrauding of the customers and, in fact, the defrauding of the government by using intermingled accounts. Infoods was using Sea Veg as an importer to import the products. It was imported. But how did the intermingling defraud the government as opposed to the false invoice? I believe you're correct. The actual intermingling itself probably was not a defrauding. I suppose your idea would be that's exactly why we don't want to turn on the alter ego test, because it's complicated and very fact-specific, and that it makes more sense, in your view, to say that D includes haters and betterment. That's correct, Ron. It's our position that the alter ego test here is not necessary. However, if the court were to reach that, and it is a complicated analysis, that we believe there are sufficient facts to demonstrate that these two companies were essentially the same. They were operated as the same company, out of the same buildings, by the same owners, and used the same accounts. Are you distinguishing between the doctrine of alter ego or alias, as the trial court referred to it, and the doctrine of piercing the corporate veil? I believe so, because I believe piercing the corporate veil would refer, if we were going after the parent company or the principal of one of the companies, we would, in essence, be attempting to pierce the corporate veil, to reach through and go after the parent or the principal. In this case, we're saying that, yes, they were, in fact, alter egos of each other. Legally, are you suggesting that that doesn't require the same showing that a piercing of the corporate veil requires? I think it would require a very similar showing. However, I don't believe it would require the exact same showing, because it's somewhat of a different issue. Here, the question would be, were they acting as one corporation? Not was there a principal trying to hide behind a corporate protection veil and pierce it through that veil? Maybe it is the difference that piercing the corporate veil analysis disregards the corporate form for all purposes, whereas this alter ego theory would only ignore the corporate form to the extent that the corporate form was used to perpetuate fraud. I think that's a legitimate interest question. And you didn't try to show that the corporate veil should be pierced? We didn't make a specific attempt to show that the corporate, we didn't attempt to pierce the veil in the sense of going after the parent company or going after the principals. We simply asserted that the fraud was committed by both Infood and SeaVeg, and they operated as the same company in alter ego analysis. Finally, Infood's arguments pertaining to the statute of limitations is without basis. As this court previously held, the United States filed within the applicable statute of limitations. Infood signed the statute of limitations waivers beginning in 1989, and each statute of limitations waiver waived the statute of limitations as applied by 19 U.S.C. When was the last of those waivers? The last waiver was in 1999. One further question, if I could. Would you care to respond to the argument that the disclaimers terminated the fraud? Certainly. The disclaimers did not, in fact, terminate the fraud in this instance. While Infood's did begin issuing the disclaimers of the program, began submitting the disclaimers to customs after customs had initiated its investigation for fraud, Infood's, in those disclaimers, said that the values were not final and that the values would be updated once an audit was complete. Contrary to what Infood's has asserted in court today, those values were never updated. How does that show that there was fraud in the first place? How does the failure to update show that there was fraud in the first place with respect to the invoices, with respect to the entries that had been submitted? The fraud in the first place is dependent on the finding of the trial court that there was, in fact, a fraud committed on customs by the falsification of these invoices that had been submitted to customs. Maybe I'm not clear. Suppose that they had, in fact, come back later and corrected the invoices. Would that show a lack of fraud? I think that would be a mitigating factor, Your Honor. Well, that sounds like mitigation of the penalty rather than evidence that there wasn't any fraud. No. Your Honor, in the disclosures that they made to customs upon importation, they said they were awaiting an audit and they would update the final values at some point. It's unclear what audit they were awaiting because there was no evidence at trial that they ever updated those values pursuant to any audit that was conducted at Infood's. The fraud is, in fact, continuing to state these undervaluations when there was evidence that Infood's was in possession of the correct values, and the fraud was stating that an audit was occurring and the values would later be updated. However, an update never occurred. Let me ask the question a little bit differently. I had the same concern that Judge Decker had. What if there had never been any earlier statements that didn't have the disclaimer? And you're dealing with one statement and it has a disclaimer. It says, here are a set of values. These values are not the final values. The final values will be provided later. What's fraudulent about that? Even if the first set of values is known to the company not to be what ultimately will be the true values. It's fraudulent because we demonstrated at trial that Infood's did, in fact, know the final values. It had an agreement with the Mexican producers of these vegetables that set forth the values that would be paid for the vegetables. We demonstrated that there was an agreement that these prices would, in fact, be reduced on the invoice that was submitted to customs. Well, I guess let me ask the question yet another way. What would customs have been led to do by way of reliance on such a heavily disclaimed statement that an accurate statement would not have led them to do? Customs would, in my experience, I can't say what customs would have done in this instance. Customs would follow up with a questionnaire asking, all right, you put down this provisional value. What's the final value? Customs would have the option to do that. What I'm trying to get at is how did this limited disclosure prejudice customs by food? In what respect was customs defrauded by a disclaimed number? Supposed they had sent in something which said, gee, we don't have the correct number right now for you. But they did have the correct number. Would that be fraudulent? Yes. That's, in fact, lying to customs. But would it be fraud? It would be false. But would it be fraudulent? How would it? If there was a demonstration, which we demonstrated at trial, that the purpose of that submission was to reduce the amount of duties paid, which in this case we demonstrated at trial, then yes, it would be a fraud because you're, in fact, lying to customs to reduce the amount of duties paid. Isn't the point that the audit's almost a charade because they have the actual values the whole time? That's correct, Your Honor. They know them. They're in their records. And yet they're going through the audit to find out what they already know. That's correct, Your Honor. Was there testimony that there was no audit going on at the time? No, there was no such testimony. There was no evidence produced by injuries that there was, in fact, an audit going on that day. As far as customs knew, there was no attempt to update these values for customs reporting purposes, Your Honor. And there was testimony to that. For these reasons, we respectfully request that you affirm the decision. Just the last thing you said, I want to make sure we have your answer. You said there was evidence to that effect. To the effect that customs testified that influence did not, in fact, update the values. I see. Okay. And what you're saying is that the Herd and National Criteria properly find that there was never a plan to update it, and that was the fraud. That's correct, Your Honor. Thank you, Your Honor. Mr. Sergeant Grand, Mr. Peterson, you have less than two minutes remaining. Let me be brief on that. I think the government indicated why, in fact, the use of the words Cayman Islands doesn't put this case at an end. It's perfectly legitimate to have a foreign company act as an importer of a record. Customs knows you have a foreign company. Maybe it's a little harder to recover a debt against a foreign company, but they've got the customs surety bond system. It gives them a secondary obligor, and it gives them an absolutely sufficient legal remedy. The fact that they didn't exercise their legal remedy here doesn't mean that the CIT is justified in going out and fashioning a new equitable remedy for the government. The fact is the government waited until Seabank had gone bankrupt. Maybe they went bankrupt because they had customs duty obligations they couldn't pay, but there was nothing fraudulent about the bankruptcy. The government just sued the wrong person, didn't have its legal remedy. I mean, they had their legal remedy. They hadn't asked for enough bonding, and now they try to bootstrap themselves into having vicarious duty liability against a no longer existing company visited on influence through an equitable theory. And I submit the court lacked the authority to do that. As to the question of the judge that I proposed about Section 592 and why it does not apply to parties other than the import of record, I would say that the fact is that Section 592D does not say that duties shall be collected from somebody. It says that duties shall be restored. And I think the use of the words restored rather than assessed suggests that what Section 592D intends is that the person who owed the duties and who withheld the duties from customs should restore them. If 592D was intended to create a broader range and cause of action against other persons, it would have so said. Finally… The government, in its own brief, said that any lack of alacrity in going back to correct might have been just benign neglect. The fact that customs set up an audit doesn't indicate there was any fraud. The actual final transaction values were not knowable at the time of entry. They depended on resale prices that occurred after importation. So there was no way that influence could put on its entry a final accurate duty. Now, they had told the government, this isn't the accurate duty. We're going to have to get you information. You've got our contracts. You know it's based on resale prices. Now, the government is saying, well, we somehow committed fraud by not coming forward with volunteering evidence. But the government had already said, we're going to do an audit. We're going to get that information through an audit. So the information was being provided. You know, I mean, the government had said, we're going to look at you. We're not just going to take this. We're going to go in and we're going to verify the information you give us. So there was no fraud there. Even the government suggested that benign neglect. The point here, Your Honor, is you need more than just falsity to have a 592 violation. You need falsity plus materiality, which I don't even think you've got materiality once these disclaimers go in. But then in this case, to have the fraud verdict that the Court of International Trade entered, they have to do a couple things. First, they have to find— The government's theory on materiality is that these disclaimers led the government to think that you were acting in good faith and would take care of it. Whereas, in fact, that wasn't the case. That would be an independent, unilateral assumption on the part of the government. The government had already said they were coming forward to get the additional information. They were auditing us. And we made all of our books and records available to them. What do you mean? Immediately after these disclosures were made, they started an investigation shortly after the April 10th disclosure started going in. See, the point is, to sustain the verdict, the Court has to find— Mr. Peterson. Pardon? Do you have some final thought before us? Final thought. In order to sustain this verdict, CIT had to find that CVEG acted fraudulently, notwithstanding the misdemeanors. They have to find that the government proved, by clear and convincing evidence, that despite the disclaimers, CVEG acted fraudulently. Then, to pin liability on in-foods, they have to show, by clear and convincing evidence, how in-foods did something to aid and affect the CVEG fraud. It didn't happen. Thank you. Thank you.